# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR438 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| SADE J. DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

    This matter is before the court on the motion to suppress filed by defendant Sade J. Davis (Davis) (Filing No. 19). Davis is charged in the Indictment with conspiring to distribute 500 grams of cocaine and the knowing possession of 500 grams of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1). **See** Filing No. 1. Davis seeks to suppress any statements she made to, or observations made by, the Commercial Interdiction Unit (CIU) of the Nebraska State Patrol (NSP) at the Greyhound Bus Depot in Omaha, Nebraska, on December 6, 2010. Davis filed a pre-hearing brief (Filing No. 20) in support of the motion. The government filed a pre-hearing brief (Filing No. 25) in opposition to the motion.

    On February 7, 2011, the court held an evidentiary hearing on Davis' motion. Davis was present with her appointed counsel, Adam J. Sipple. Assistant United States Attorney Robert C. Sigler represented the United States. During the hearing, the court heard testimony from NSP Investigators Alan Eberle, Jr. (Investigator Eberle), Richard Lutter (Investigator Lutter), and Jason Scott (Investigator Scott). The court received into evidence Exhibit 1 - DVD of NSP interview of Davis, and Exhibit 2 - an advice of rights form. **See** Filing No. 29. A transcript (TR.) of the hearing was filed on February 18, 2011 (Filing No. 35).

## FINDINGS OF FACT

    Investigators Eberle, Scott, and Lutter, were at the Greyhound Bus Depot in Omaha, Nebraska, on December 6, 2010 (TR. 6-8). The officers were dressed in plain clothes and each was armed (TR. 26-27). The officers met the inbound bus traveling from the West

Coast to Chicago, Illinois (TR. 7). In accordance with their protocol, the officers watched the passengers as they left the bus and then made a visual inspection of the luggage in both the passenger compartment and underneath the bus in the luggage bays (TR. 8). The bus had three luggage bays, a front, middle, and rear bay (TR. 11). The officers examined the bags in the luggage bays without disturbing the bags (TR. 8-9). During this examination, Investigator Lutter noticed a blue bag (Bag 1) with a "JIO" emblem and bearing a single handwritten tag showing a destination of Minneapolis, Minnesota (TR. 8). There was no information on the tag identifying the owner of Bag 1 (TR. 8-9, 64). Bag 1 was located in the front luggage bay (TR. 8). Subsequently, Investigator Scott discovered a black bag (Bag 2) with a "JIO" emblem and bearing a single handwritten tag showing a destination of Minneapolis, Minnesota (TR. 10, 64). There was no information on the tag identifying the owner of Bag 2 (TR. 10, 64). Bag 2 was located in the rear luggage bay (TR. 11).

As the passengers were re-boarding the bus, Investigators Lutter and Scott stood by the bus door, pointed at Bag 1 (still undisturbed inside the front luggage bay, which was observable by the boarding passengers), and asked each passenger whether the bag belonged to the passenger (TR. 12). While Davis was standing in line waiting to board the bus, Investigator Lutter asked her if Bag 1 belonged to her (TR. 76). Davis' eyes opened "real wide," she stated no, and boarded the bus in an otherwise normal fashion (TR. 76-78). Although everyone had re-boarded the bus, nobody claimed ownership of Bag 1 (TR. 14). Next, Investigator Lutter removed Bag 1 from the luggage bay, unzipped Bag 1, and inspected its contents (TR. 14). Inside he found two pillows, a sweatsuit, a brown powdery substance that he believed to be hot chocolate mix, and a plastic lid approximately five inches in diameter, but no indicia of ownership (TR. 14, 20). Products like hot chocolate mix are used to mask the odor of controlled substances (TR. 15). Based on his training and experience, Investigator Lutter believed Bag 1 had previously contained controlled substances, however, there were no controlled substances or suspected controlled substances found inside Bag 1 (TR. 15-16).

Next, Investigators Lutter and Scott retrieved Bag 2 from the rear luggage bay and boarded the bus with it (TR. 16). Investigator Scott stood at the front of the bus and held Bag 2 while Investigator Lutter individually asked each passenger, including Davis, if they

owned Bag 2 (TR. 16). No passenger claimed ownership of Bag 2 (TR. 17). Subsequently, Investigator Lutter removed Bag 2 from the bus and while just outside the door of the bus, he opened Bag 2 and found two large plastic containers, but no indicia of ownership (TR. 18, 20). Then, Investigator Lutter, accompanied by Investigator Scott, took Bag 2 into the bus station's baggage room, opened the large plastic containers, and found several duct-taped bundles, each about the size of a baseball, inside of one of the containers (TR. 18-20). Investigator Lutter cut open one of the bundles and found a white powder, consistent with cocaine (TR. 19).

Next, Investigators Lutter and Scott re-boarded the bus and attempted to locate "any passengers possibly traveling to the Minneapolis, Minnesota area" (TR. 20). Investigator Lutter walked to the very back of the bus and began asking the passengers, individually, to show him their ticket (TR. 21). Investigator Scott started at the very front of the bus and asked the passengers, individually, to show him their ticket (TR. 21-22). Investigator Lutter presented his badge and ID, and identified himself as a police officer to the first passenger he encountered (TR. 25, 66-67). His identification was loud enough that the other passengers, including Davis, were able to hear it (TR. 25, 66-67). When Investigator Lutter reached Davis, she showed him her ticket that indicated she was traveling to Minneapolis, Minnesota (TR. 22). Investigator Lutter continued checking passengers' tickets and discovered a second passenger, Roy Chandler (Chandler), was also ticketed to Minneapolis (TR. 23). At this point, Investigator Lutter reached Investigator Scott, who had checked the tickets of passengers seated in the front half of the bus (TR. 24).

While standing in the bus aisle, Investigator Scott told Investigator Lutter he had not identified anyone traveling to Minneapolis, Minnesota (TR. 24). Investigator Lutter replied he had identified two passengers ticketed to Minneapolis, Davis and Chandler (TR. 24). Investigator Lutter pointed at Davis and Chandler at that time (TR. 24). Then, in a conversational tone, Investigator Lutter told Davis "we're trying to identify the owners of the two bags in question," and then asked Davis if she would grab her things and exit the bus so he could speak with her in regards to the ownership of Bag 1 and Bag 2 (TR. 24, 26, 79). Davis exited the bus carrying a pink and black backpack (Bag 3) (TR. 34). Investigator Lutter asked Chandler to exit the bus (TR. 27). Chandler, Davis, Investigator Lutter, and

Investigator Scott all exited the bus together (TR. 27). As Davis and Chandler exited the bus, Investigator Scott walked in front of them and Investigator Lutter walked behind them (TR. 27).

After exiting the bus, Investigator Scott began to question Chandler next to the bus (TR. 27). Investigator Lutter asked Davis to accompany him to the bus station's baggage room (TR. 27). The baggage room has an area of approximately 30 square feet and has several doors, one to the main terminal, one to the ticket counter, one that leads to the outside, and one set of double doors that lead to the bus loading and unloading area (TR. 29). Bag 1 and Bag 2 were present in the baggage room when Investigator Lutter and Davis arrived there (TR. 28). Once inside the baggage room, Investigator Lutter began questioning Davis (TR. 28). Almost immediately thereafter, Investigator Scott entered the baggage room with Chandler (TR. 50). Investigator Eberle entered the baggage room approximately three to four minutes after Investigator Lutter and Davis entered the room (TR. 55).

In the baggage room, Investigator Lutter showed Davis his badge and identification and identified himself as a police officer with the NSP (TR. 31). He also told Davis "she was not under arrest or in any kind of trouble at that time" (TR. 31). Davis agreed to continue the conversation and answered the questions posed by Investigator Lutter (TR. 31). Davis stated she was not traveling with anybody else on the bus (TR. 31). Davis also stated that she was returning home to Minnesota from California, where she had been visiting a friend (TR. 31-32). During the questioning, Davis did not make eye contact with Investigator Lutter, frequently looked across the room at Chandler, and appeared very nervous (TR. 31). Investigator Lutter formed the impression that Davis was looking for some sort of direction from Chandler based on her behavior (TR. 31). Eventually, Investigator Lutter pointed to Bag 1 and Bag 2 and again asked Davis if they were her bags (TR. 33). Davis again denied ownership of the bags (TR. 33). Investigator Lutter asked Davis if she had any property on her person or in her luggage that would associate her with Bag 1 and Bag 2 (TR. 33). Davis stated she did not (TR. 33).

Then, Investigator Lutter asked Davis for permission to search her person and Bag 3 (TR. 33). Without hesitation, Davis agreed to the search (TR. 33). Investigator Lutter had

Davis empty her pants pockets and pull them out so he could see the liner of her pockets (TR. 34). Investigator Lutter also manipulated Davis' coat during his search of her person, but did not touch her body (TR. 34). After searching Davis, Investigator Lutter began to search Bag 3, the pink and black backpack Davis brought with her when she exited the bus (TR. 34). During his search of Bag 3, Investigator Lutter discovered two computer-generated airline baggage claim stubs, one with Davis' name on it and the other with Chandler's name on it (TR. 35). While Investigator Lutter was searching Bag 3, Investigators Scott and Eberle became involved in the questioning of Davis (TR. 37-38).

Investigator Scott asked Davis if he could examine her bus ticket and she again produced her ticket (TR. 37). Investigator Scott compared Davis' bus ticket to Chandler's and told Investigator Lutter that both tickets had been purchased within one minute of each other at the same location (TR. 37). Investigator Scott made this statement loud enough that everyone in the room could hear him (TR. 37).

Investigator Eberle picked up Davis' cell phone, which was laying on the table, and asked if he could examine the contents of the phone (TR. 38). Davis refused this request (TR. 38). As Investigator Eberle returned the phone to the table, the phone began to ring (TR. 38). Investigator Eberle observed the phone number calling Davis' phone, which was displayed on the front screen of the phone (TR. 38-39). Investigator Eberle told Investigator Lutter the phone number was the same number that had recently called Chandler's phone (TR. 39).

At that time, Investigator Lutter handcuffed Davis (TR. 39). He told her that based on the false information she had provided regarding her travel arrangements and her association with Chandler, he believed her to be directly involved in criminal activity (TR. 39). Investigator Lutter advised Davis there was no specific charge because the investigation was not completed (TR. 39). Using a standard issue NSP advice of rights card, Investigator Lutter advised Davis of her *Miranda* rights and told her before asking her any additional questions she must understand each of those rights (TR. 40). Davis indicated she understood her *Miranda* rights and continued to answer questions posed by Investigator Lutter (TR. 41-42). Between seven and twelve minutes elapsed from the time Investigator Lutter asked Davis to step off the bus to the time he advised her of her *Miranda*

rights (TR. 43-44).  At the time Investigator Lutter handcuffed Davis and advised her of her *Miranda* rights, the bus was still not ready to depart the Omaha bus terminal (TR. 30, 44).

## LEGAL ANALYSIS

Davis urges the court to grant the motion to suppress her statements for two reasons: (A) Davis argues she was seized within the meaning of the Fourth Amendment without reasonable suspicion when Investigator Lutter escorted her off the bus;  and (B) Davis contends that she was in custody for purposes of *Miranda* during the questioning in the baggage room and therefore should have been advised of her *Miranda* rights at the outset of the questioning.  In contrast, the government first argues Davis consented to exit the bus and no seizure occurred until Investigator Lutter handcuffed her, and even if a seizure did occur, probable cause to arrest Davis existed at the time Investigator Lutter escorted her off the bus.  Second, the government argues that Davis was not in custody for purposes of *Miranda* until Investigator Lutter handcuffed her.  For the reasons stated below, the court finds as follows: (A) Davis was seized within the meaning of the Fourth Amendment when Investigator Lutter escorted her off the bus, however, said seizure did not violate the Fourth Amendment because it was merely an investigative detention and reasonable suspicion to detain Davis existed; and (B) Davis was not in custody for purposes of *Miranda* when Investigator Lutter questioned her in the baggage room.

### A.    Seizure of Davis

Under the Fourth Amendment, encounters between the police and citizens fall broadly into two categories:  (1) consensual or voluntary encounters, which implicate no Fourth Amendment concerns, **see, e.g.,** *Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008); *United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006); and (2) seizures, which invoke the full protection of the Fourth Amendment, **see, e.g.,** *U.S. Const. amend. IV*; *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *Griffith*, 533 F.3d at 983-84; *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007).  "Determining which police-citizen contacts fall within

6

the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *Griffith*, 533 F.3d at 983. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16. The government has the burden to prove an encounter was consensual or voluntary and not a seizure. **See** *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority.").

While there is no bright line rule to distinguish a consensual encounter from a seizure, the court must assess whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Griffith*, 533 F.3d at 983 (**quoting** *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A non-exclusive list of factors to consider when determining whether a seizure has occurred include:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*Id.* (internal citations omitted). A seizure does not occur when a police officer approaches an individual and questions him -- so long as the officer does not convey a message that compliance with his request is required. *Bostick*, 501 U.S. at 434; **see also** *United States v. Drayton*, 536 U.S. 194, 200-01 (2002). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Griffith*, 533 F.3d at 983 (**quoting** *Michigan v. Chestemut*, 486 U.S. 567, 573 (1988)).

A reasonable person in Davis' position would not have believed that she was free to refuse Investigator Lutter's request to exit the bus. The court finds the investigators' conduct had a coercive effect when taken as a whole, particularly where Investigator Lutter had already identified himself as a law enforcement officer, there were multiple investigators

present on the bus, and the investigators were positioned in a manner that restricted Davis' ability to either leave her seat or exit the bus. In addition, Investigator Lutter told Davis "we're trying to identify the owners of the two bags in question," before he asked her to grab her things and exit the bus, thus, indicating Davis was the focus of an investigation (TR. 26). Investigator Lutter's size (6'6" tall and weighing 282 pounds) is an additional factor that weighs in favor of finding a coercive effect on Davis. Finally, the fact Investigator Lutter framed his request as a question does not establish this as a consensual encounter when a reasonable person would not feel free to refuse the request. **See** *Mendenhall*, 446 U.S. at 554. Because a seizure within the meaning of the Fourth Amendment occurred when Investigator Lutter asked Davis to exit the bus, the court must determine whether said seizure was an investigative detention or an arrest.

Under the Fourth Amendment, there are two types of seizures: (1) investigative detentions and (2) arrests. **See, e.g.**, *Terry*, 392 U.S. at 1; *Griffith*, 533 F.3d at 983-84; *Saenz*, 474 F.3d at 1136. An investigative detention is a seizure of limited scope and duration within the meaning of the Fourth Amendment. **See** *Terry*, 392 U.S. at 1. Officers may continue an investigative detention for a reasonable period in order to verify or dispel the suspicion giving rise to the detention. *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005). "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly." *Dickson*, 58 F.3d at 1263 (**quoting** *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

The seizure of Davis was limited in scope and duration. The detention consisted of questioning and lasted no more than approximately 12 minutes, a reasonable period. The questioning took place in a location adjacent to the bus' location, the baggage room. Moreover, the investigators diligently pursued their investigation by immediately questioning Davis regarding her travel plans and searching Bag 3, with Davis' consent. Finally, the detention was completed before the bus was prepared to leave, so the detention did not interfere with Davis' travel. Therefore, the court finds the seizure of Davis was an

investigative detention, not an arrest. As such, the court must determine whether reasonable suspicion to detain Davis existed when she was escorted off the bus.

"It is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Maltais*, 403 F.3d at 554 (**quoting** *Sokolow*, 490 U.S. at 7 (internal quotation and citation omitted)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "[A]n officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003). "Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch." *Griffith*, 533 F.3d at 983.

Here, Investigator Lutter's encounter with Davis was based on more than a hunch. Investigator Lutter was aware of several facts that indicated criminal activity was afoot and that Davis could be involved. First, Davis' eyes opened wide when asked if she was the owner of Bag 1 and the search of Bag 1 revealed indicia of drug trafficking (hot chocolate mix). Second, the "JIO" emblem and handwritten baggage tag linked Bag 1 to Bag 2 and the search of Bag 2 revealed approximately four (4) pounds of cocaine.[1] Third, the baggage tags on Bag 1 and Bag 2 indicated both bags were bound for Minneapolis and Davis' ticket indicated she was bound for Minneapolis. Finally, there were only two passengers on the entire bus ticketed for Minneapolis. As such, Investigator Lutter had a reasonable articulable suspicion for the investigative detention of Davis. Therefore, the court finds that although Davis was seized within the meaning of the Fourth Amendment when she was

---

[1] Although Davis does not argue the search of Bag 2 was unconstitutional, the court finds that when the NSP investigators took possession of Bag 2 and carried it onto the bus in order to questions passengers about ownership of Bag 2, Bag 2 was seized within the meaning of the Fourth Amendment. Nevertheless, because the previous search of Bag 1 revealed indicia of drug trafficking (hot chocolate mix in bag) and because the "JIO" emblem and baggage tag linked Bag 1 to Bag 2, reasonable suspicion to seize Bag 2 existed at the time NSP investigators seized it. The seizure of Bag 2 was limited in scope and duration, lasting only a few minutes. Subsequently, once no passenger claimed ownership of Bag 2, it became abandoned property and therefore no warrant, reasonable suspicion, or probable cause was needed to search Bag 2.

9

escorted off the bus, said seizure did not violate her Fourth Amendment rights because it was an investigative detention, not an arrest, and was supported by reasonable suspicion.

### B. Questioning of Davis in Baggage Room

It is well settled that a law enforcement official is required to advise an individual of his or her *Miranda* rights before questioning if that individual is in custody. *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). "An individual is in custody [for purposes of *Miranda*] when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest." *Elzahabi*, 557 F.3d at 883 (**citing** *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006). In other words, whether an individual is "in custody turns on whether, under the totality of the circumstances he faced at the time of his questioning, a reasonable person in his position would have felt free to end the interrogation and leave." *Id.*

The Eighth Circuit has identified the following six factors to consider when determining whether an individual is in custody:

> (1) whether the suspect was informed that he or she was free to leave and that answering [questions] was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong-arm tactics or strategies were employed; (5) whether the atmosphere was police-dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

*Id.* (**citing** *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). Application of these factors is not mechanical and the issue of whether an individual is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichrary*, 378 F.3d 822, 827-28 (8th Cir. 2004). From this principal it follows that the presence or absence of any one factor is not determinative on the issue. *Griffin*, 922 F.2d at 1347. Instead, a court must "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." *Id.* (**quoting** *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Under the totality of the circumstances, the court finds that Davis

was not in custody for purposes of *Miranda* when she was questioned by Investigator Lutter (and others) in the baggage room.[2]

First, although Investigator Lutter never specifically told Davis she was free to leave or not answer questions, he did tell her "that she was not under arrest or in any kind of trouble" when the interview in the baggage room began. This weighs heavily in favor of finding Davis was not in custody. See *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (finding of custody mitigated when suspect was told he was not under arrest); **see also** *United States v. Hamel*, 769 F.2d 1306, 1320-21 (8th Cir. 1985) (informing defendant he was not under arrest "significant" in finding non-custodial questioning). Moreover, Davis has not presented any evidence that her freedom of movement was restrained during the questioning. The fact the questioning took place inside a relatively small room is largely irrelevant to the analysis. See *Mathiason*, 429 U.S. at 495 (finding suspect not in custody when interrogated for thirty minutes inside a small, windowless room at police station). Further, the questioning did not take place in an environment dominated by police. Although Davis was removed from the bus, Chandler was present in the baggage room when Investigator Lutter was questioning Davis and Davis made frequent eye contact with Chandler while she was being questioned. There is no evidence the investigators used any strong arm tactics when questioning Davis and when the questioning began, there were two civilians (Davis and Chandler) and two investigators (Lutter and Scott) in the room.[3] An additional factor that weighs in favor of finding a non-custodial situation is the fact Davis had her cellular phone with her during the questioning. See *United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) ("While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained.") Finally, while Davis was handcuffed and placed under arrest at the end of the questioning, this one factor is not dispositive on the issue.

---

[2] Clearly Davis was in custody when Investigator Lutter handcuffed her; however, he advised her of her *Miranda* rights at that time.

[3] Investigator Eberle did not enter the room until three to four minutes after the questioning had begun.

See ***Griffin***, 922 F.2d at 1347. Because Davis was not in custody for purposes of ***Miranda***, Investigator Lutter was not required to advise Davis of her ***Miranda*** rights before questioning her in the baggage room. Upon consideration,

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Sade J. Davis' motion to suppress (Filing No. 19) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 15th day of March, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.